Filed 7/10/14  P. v. Bruns CA5

## <u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JACOB WAYNE BRUNS,<br><br>    Defendant and Appellant. | F065981<br><br>(Super. Ct. No. BF137614A)<br><br>**OPINION** |

-ooOoo-

### <u>THE COURT</u>*

APPEAL from a judgment of the Superior Court of Kern County.  Cory J. Woodward, Judge.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

\*    Before Levy, Acting P.J., Gomes, J. and Franson, J.

A jury convicted appellant, Jacob Wayne Bruns, of one count of unlawful sexual intercourse with a person not his spouse who was under the age of 16 (Pen. Code, § 261.5, subd. (d);[1] count 1) and two counts of commission of a lewd or lascivious act against a child of 15 years by a person at least 10 years older than the victim (§ 288, subd. (c)(1); counts 2, 3). The court imposed a prison term of three years eight months, consisting of the three-year midterm on count 1, and eight months on count 3, representing one-third of the midterm on that offense. On count 2, the court imposed, and stayed pursuant to section 654, the two-year midterm.

Appellant's appointed appellate counsel has filed an opening brief which summarizes the pertinent facts, with citations to the record, raises no issues, and asks that this court independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436.) Appellant has not responded to this court's invitation to submit additional briefing. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Facts*

Appellant's Relationship with Amber S.

On February 13, 2010,[2] when Amber S. was 14 years old, she encountered appellant, a family friend who she had not seen for several years, at Whiskey Flats Days, a festival in Kernville.[3] After they talked, "just kind of catching up," appellant kissed Amber, and within approximately one month, the two began a sexual relationship. They would get together three or four times per week, typically at Amber's home—a three-bedroom mobile home where she lived with her mother, stepfather and stepgrandfather—when her mother and stepfather were not home, or at the "school farm," and "just

---

[1] All statutory references are to the Penal Code.

[2] All references to dates of events are to dates in 2010.

[3] Except as otherwise indicated, our summary of the facts of the instant offenses is taken from Amber's trial testimony.

hangout [*sic*] or watch TV or … have sex." They would have sex "several times" per week, typically in Amber's bedroom when her mother and stepfather were not home, or at appellant's mother's "old house." At some point the frequency of their contacts "kind of stopped and then it picked back up again." The sexual relationship lasted "[s]ix months to a year."

## Counts 1 and 2

On or about June 4, approximately one hour after it had gotten dark, appellant arrived at Amber's home, at her invitation, and entered Amber's bedroom through the window located above Amber's bed. A short time later, the two were "having sex" when Amber's mother "walked in on [them]." Appellant, who was wearing no clothes, stood up on the bed and jumped out the window. He left a pair of boxer shorts in the room.

Amber told her mother the person in the room with her was a boy who lived in another town. Amber also talked with police that day. She was not truthful because she loved appellant and did not want him to get in trouble.

Amber's mother, Carrie Mae Gibson, testified that one day "somewhere around June," after dark, she was with her husband in the bedroom the two shared when "the trailer started rocking." She went to Amber's room, opened the door and "[saw] this guy having sex with [Amber]." Then she saw "a naked body darting out the bedroom window." At the time she could not tell who the person was. Gibson was acquainted with appellant. Amber told her "it was somebody else." Gibson found some "clothing" in the room, including a pair of boxer shorts, which she turned over to a deputy sheriff.

## Count 3

On one occasion "[t]owards the end of June," Amber, wearing shorts but no shirt, and with her bra unhooked, was lying on her bed, on her stomach, and appellant was "on top of [her]," rubbing her back with his hands, when Amber's mother "walked in."

Gibson testified that approximately two weeks after the incident in early June described above, Gibson, upon arriving home with her husband, walked past Amber's

3

room and saw appellant and Amber in the room, on Amber's bed. Each was wearing a tank top and short pants. Amber was on her knees with "her hands … out [in] front," "kind of on all fours." Appellant was on his knees, behind Amber, "in doggy style position," "[h]is groin area was up against [Amber's] buttocks," and he was rubbing Amber's shoulders with his hands. Gibson did not see any other motion. She asked "'What the hell is going on?'" Appellant said he was "just giving [Amber] a rub down," and Amber said appellant was giving her a "'sensual massage.'" Gibson called the Sheriff's Department.

*Appellant's Admissions*

According to Gibson's testimony, at some point after the late June incident, Amber informed her and her husband that she (Amber) had been having a sexual relationship with appellant. Kern County Deputy Sheriff Zachary Bittle testified he arranged for, and on July 11, 2011, Amber made, a recorded "pretext phone call" to appellant for the purpose of "obtain[ing] evidence to use against [appellant]." The recording was played for the jury. A transcript of the recording, made part of the record on appeal, indicates the following: During the call, appellant told Amber he was in love with her and the he "want[ed] to spend [his] life with [her], if that's even possible." Amber asked how that was possible "when [appellant is] twenty-eight and [Amber is] sixteen." Appellant responded, "It can wait." He also said, he wanted to be "with" Amber but they would "have to wait till [she is] eighteen." Amber said, "We had sex before [and] didn't wait," and appellant responded, "Yeah and before was a different story. Now it's become a whole new thing."

*Forensic Evidence*

Kern County Deputy Sheriff Theodore Costello testified that on February 6, 2011, he "took [a] buccal swab of [appellant]." Taking a buccal swab, a procedure for obtaining a DNA sample, is done by rubbing a swab on the inside of a subject's mouth. A criminalist testified that she extracted DNA from semen stains found on the boxer

4

shorts found in Amber's room in early June and compared that DNA with DNA extracted from appellant's buccal swab. Based on this comparison, the criminalist concluded that appellant "was included as the contributor" of the "DNA profile" found in the semen stains on the boxer shorts. She further concluded that the probability of selecting a person at random who matched that DNA profile was one in 390 billion in the Caucasian population, one in 120 trillion in the African-American population, and one in 9.6 billion in the Hispanic population.

*Defense Evidence*

Gibson testified that in the early June incident, she had only a "few seconds" to see the back of the naked man who went out the window and that he had no tattoos "that [she] could see …." At trial, appellant removed his shirt and the court stated, "At this time [appellant] is showing front, back, and both sides of his body of the tattoos [*sic*]; and, in addition, a tattoo on the lower right leg." The parties stipulated that "all tattoos displayed to the jury were present on [appellant's] body before June 2010, with the exception of the Chinese writing tattoo on his right forearm."

### Motion to Suppress Evidence

Appellant moved to suppress the buccal swab taken from him on February 6, 2011, and the results of tests performed on the swab. A hearing was conducted on the motion prior to trial. Appellant testified that Deputy Costello came to his house on February 6, 2011. During a conversation with the deputy, appellant stated he was "going through a divorce and had some kind of paternity dispute …." Costello's response "was roughly, well, we can kind [of] help you get the ball rolling on that if you'd … giv[e] us a DNA sample." Appellant agreed to do so, and Costello retrieved a "kit" from his car, returned to appellant and "administered the test …."

Costello testified on direct examination that he went to appellant's residence on February 6, 2011, asked appellant if he (the deputy) "could obtain a buccal swab," appellant "said yes," and Costello "obtain[ed] a buccal swab from him."

5

On cross-examination, Costello testified that he was not "aware [appellant] had had a court date the day before, regarding some kind of custody dispute[.]" Costello "recall[ed] that [appellant] was talking about his daughter at some point and either his wife or his ex-wife," but the deputy did not "recall exactly what the conversation was about." Costello did not recall "offering … to assist [appellant] with his paternity dispute," "tell[ing] him why [he (Costello)] needed a Buccal swab," or "tell[ing] him something like, we can get this test done to get the ball rolling on [appellant's] other case."

## DISCUSSION

Following independent review of the record, we have concluded that no reasonably arguable legal or factual issues exist.

## DISPOSITION

The judgment is affirmed.